USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 93-1661 UNITED STATES OF AMERICA, Plaintiff, Appellee, v. STEPHEN E. WILLIAMS, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. William G. Young, U.S. District Judge] ___________________ ____________________ Before Torruella, Circuit Judge, _____________ Bownes, Senior Circuit Judge, ____________________ and Cyr, Circuit Judge. _____________ ____________________ William J. Genego for appellant. _________________ Roberta T. Brown, Assistant United States Attorney, with whom A. _________________ __ John Pappalardo, United States Attorney, and Michael K. Loucks, ________________ ___________________ Assistant United States Attorney, were on brief for appellee. ____________________ December 3, 1993 ____________________ CYR, Circuit Judge. Pursuant to a plea agreement, CYR, Circuit Judge. _____________ appellant Stephen Williams pled guilty to fourteen counts of mail fraud, whereupon other charges were dismissed and Williams was sentenced to seven months' imprisonment. On appeal, Williams challenges, among other things, the district court's denial of his request for an evidentiary hearing and its determination that certain criminal acts alleged in the dismissed counts constituted "relevant conduct" under the counts of conviction. Finding no error, we affirm. I I FACTS FACTS _____ In 1980, Williams and codefendant Bruce Kotek founded S.E.R.V.E.S.S., Inc. (SERVESS), a Massachusetts not-for-profit ______________ corporation which operated homes for the handicapped. SERVESS entered into at-cost contracts with the Commonwealth of Massa- _______ chusetts (Commonwealth) for the placement of mentally handicapped persons in SERVESS group homes. These contracts entitled SERVESS to reimbursement for its expenses but prohibited it from realiz- ing a profit. In 1984, while serving on the SERVESS board of directors, Williams and Kotek established Community Services, Inc. (CSI), a for-profit corporation which would contract with __________ companies like SERVESS to operate their group homes in return for a management fee. In July 1984, Williams and Kotek, in their capacity as SERVESS directors: (1) voted to enter into a manage- ment contract with CSI; (2) promoted a SERVESS employee, William Polis, to serve as SERVESS's new executive director; and (3) resigned from the SERVESS Board effective August 31, 1984. On September 1, 1984, the day after the Williams and Kotek resigna- tions became effective, the SERVESS-CSI management contract was executed by Polis on behalf of SERVESS. In 1985, during Polis's tenure, at the instance of Williams and Kotek SERVESS entered into several long-term leases of property owned by real estate trusts controlled by the third codefendant, Robert Alexander. Although only Alexander received income from these properties, Kotek, Williams and Alexander were all residual beneficiaries under the real estate trusts. In January 1986, Williams and Kotek founded another not-for-profit corporation called D.A.R.S.O., Inc. (DARSO), which ______________ operated day-care centers for mentally handicapped persons. Like SERVESS, DARSO contracted directly with the Commonwealth for reimbursement of its at-cost expenses, and leased several parcels of real property from the same real estate trusts. DARSO also purchased furniture from a company in which Williams held an interest. Williams served as a director of DARSO from its inception. Massachusetts law requires that any not-for-profit corporation submitting expense reimbursement requests to the Commonwealth disclose whether the expense was incurred with a "related person," defined as "[a] person or organization which is associated or affiliated with or has control of or is controlled ___ _______ __ by the [not-for-profit corporation] or is related to the [not- 3 for-profit corporation] or any director, stockholder, trustee, partner or administrator of the [not-for-profit corporation] by common ownership or control or in a manner specified in [I.R.C. 267(b), (c).]" See 114.5 Mass. Reg. 3.02 (emphasis added). ___ In November 1990, Williams, Kotek, Alexander, and the various corporate entities were indicted for RICO violations, 18 U.S.C. 1962(c), RICO conspiracy, 18 U.S.C. 1962(d), and multiple counts of mail fraud, 18 U.S.C. 1341, in connection with the alleged SERVESS and DARSO schemes to defraud the Common- wealth. The indictment was based on Williams's failure to disclose: (1) that he and Kotek, through executive director Polis, "controlled" SERVESS at the time CSI and SERVESS entered __________ into their management contract; and (2) that both corporations leased property from real estate trusts whose beneficiaries were "related parties." The government charged that the SERVESS and DARSO reimbursement requests exceeded their costs, and that Williams and Kotek defrauded the Commonwealth by using these "hidden profits" to improve, and acquire equity in, the real estate leased to SERVESS and DARSO by the real estate trusts. At sentencing, the government characterized the dis- missed SERVESS counts as "relevant conduct" under U.S.S.G. 1B1.3 and introduced a transcript of the grand jury testimony of William Polis, to the effect that he was acting under Wil- liams's "control" when he signed the SERVESS-CSI management 4 contract in September 1984.1 Williams argued that the SERVESS scheme was too remote in time and context to constitute "relevant conduct" under the DARSO counts, and requested an evidentiary hearing for the purpose of cross-examining Polis on his grand jury testimony concerning the issue of "control." The district court denied the request for an evidentiary hearing and found the loss occasioned by the SERVESS counts to be "relevant conduct." Williams appeals the resulting seven-month prison sentence.2 ____________________ 1The gross loss occasioned the Commonwealth by the mail fraud directly related to the SERVESS counts was estimated at between $500,000 and $1 million, while the DARSO counts involved estimated loss of $50,000 to $100,000. See U.S.S.G. 2F1.1. ___ The district court imposed an 8-level enhancement, based on the $500,000 to $1 million loss occasioned by the SERVESS scheme, as "relevant conduct," see id. 1B1.3, in connection with Wil- ___ ___ liams's sentencing on the DARSO scheme counts to which he pled guilty. 2The pre-November 1989 Sentencing Guideline calculation was as follows: Base offense level ( 2F1.1) 6 + Loss between $500,000 and $1 million +8 + More than minimal planning +2 + Abuse of trust position +2 - Acceptance of responsibility -2 Adjusted offense level 16 Adjusted offense level 16 GSR (Criminal History Category I) 21-27 mos. Downward departure for Substantial Assistance -14 mos. Sentence 7 mos. Sentence 7 mos. 5 II II DISCUSSION DISCUSSION __________ The crux of Williams's grievance is that his plea agreement with the government, which led to the dismissal of the SERVESS counts, resulted in no lower sentence since the Common- wealth loss relating to the SERVESS counts was considered "rele- vant conduct" for purposes of sentencing on the DARSO counts. Our cases, see, e.g., United States v. Wright, 873 F.2d 437, 440- ___ ____ _____________ ______ 42 (1st Cir. 1989), long since have recognized the appropriate- ness of just such "relevant conduct" adjustments as these. Moreover, unlike "relevant conduct" adjustments that may appear to erode the intended benefit of a defendant's plea bargain, see ___ United States v. Fox, 889 F.2d 357, 362-63 (1st Cir. 1989); see _____________ ___ ___ also Kinder v. United States, 112 S. Ct. 2290, 2292-93 (1992) ____ ______ ______________ (White, J., dissenting from a denial of certiorari) (collecting cases and noting circuit split), in this case Williams plainly was on notice that the government would request the court to treat the SERVESS-related loss as "relevant conduct" under the DARSO counts.3 Finally, while the government reserved its right ____________________ 3The plea agreement provides: Williams agrees that the United States may argue that the loss suffered . . . from all of the fifteen charged schemes to defraud set forth in predicate acts one through fifteen of Count One of the indictment [i.e., the ____ SERVESS-related conduct] may be included by the court in its calculation of the loss suffered by the Commonwealth of Massachu- setts. The Government agrees that Mr. Wil- liams may argue that the Court should not do 6 to recommend a "relevant conduct" adjustment, the plea agreement afforded Williams significant benefit. The government agreed, inter alia, to move to dismiss all RICO and RICO-conspiracy _____ ____ counts, and to recommend a sentence at the low-end of the appli- cable guideline sentencing range. The government also left the door open to a downward departure for substantial assistance. Ultimately, of course, the district court granted a downward departure for substantial assistance, see supra note 2, on the ___ _____ government's recommendation. See U.S.S.G. 5K1.1. ___ Thus, our review discloses that both the letter and spirit of the plea agreement was observed, resulting in substan- tial benefit to Williams. The fact that the district court, in scrupulous observance of the Sentencing Guidelines and our caselaw, did not grant appellant all he had hoped does not warrant appellate relief. 1. "Relevant Conduct" 1. "Relevant Conduct" ________________ Absent a mistake of law, we review "relevant conduct" findings for clear error. United States v. Wood, 924 F.2d 399, _____________ ____ 403 (1st Cir. 1991). Only after the government has met its burden of establishing, by a preponderance of the evidence, "a sufficient nexus between the [extraneous] conduct and the offense __________ _____ of conviction," may the sentencing court, in its sound discre- tion, make a "relevant conduct" adjustment. United States v. ______________ ____________________ so. 7 Sklar, 920 F.2d 107, 110 (1st Cir. 1990) (emphasis added). The _____ district court supportably found the required nexus in this case. The principal argument advanced by Williams on appeal is that the conduct allegedly involved in the SERVESS scheme was too dissimilar to be considered "relevant" to the conduct of conviction involved in the DARSO counts.4 This supposed dissimi- larity springs from the fact that Williams's alleged criminal liability under the dismissed SERVESS counts was predicated on a determination that Williams controlled Polis, thereby causing SERVESS to violate its obligation to disclose "related parties," whereas criminal liability for the DARSO scheme rested directly on the conduct of Williams and his codefendants. The SERVESS and DARSO schemes shared a great deal in common: (1) the same victim, i.e., the Commonwealth; (2) the ____ same method of operation, i.e., SERVESS's improper requests for ____ Commonwealth reimbursement of the management fees paid CSI, or the rental fees paid for the real estate trusts; (3) the same three principals, i.e., Williams and Kotek as influential "insid- ____ ers," Alexander as the "outsider" recipient; and (4) the same underlying substantive offense, i.e., the fraudulent failure to ____ identify the defendant's "related party" status in accordance ____________________ 4Appellant's other arguments warrant little discussion. First, he questions the temporal proximity between the DARSO and SERVESS schemes. But this argument ignores the nature of the underlying crime. Assuming arguendo that the SERVESS contract ________ with CSI was executed before DARSO came into existence, the mail fraud, based on the continuing non-disclosure of Williams's ______________ "related party" status, continued well beyond that date. Appel- lant's second contention that any control exercised over Polis was "intermittent" is likewise inapposite. 8 with 114.5 Mass. Reg. 3.02. Thus, the district court reasonably could conclude that the DARSO and SERVESS schemes, while not one and the same, were nonetheless sufficiently comparable in charac- ter, cast and plot, to warrant similar billing under U.S.S.G. 1B1.3. 2. Sufficiency of the Evidence 2. Sufficiency of the Evidence ___________________________ The second argument Williams makes is that the evidence was insufficient to link him to the SERVESS scheme. The eight- level adjustment under U.S.S.G. 1B1.3 was based exclusively on the government's contention that Williams controlled Polis's approval of the CSI management contract, and the long-term leases with the real estate trusts, on behalf of SERVESS. The only "control" evidence introduced at sentencing was Polis's grand jury testimony, which Williams correctly characterizes as hear- say. Williams insists that the grand jury testimony was rendered even less reliable because the prosecutor posed a series of hostile or leading questions to Polis on the issue of "control." Moreover, Williams argues, Polis testified that following their resignations from the SERVESS Board in August 1984 neither Williams nor Kotek had the power to remove Polis as the executive director of SERVESS, and that Polis named a new board of direc- tors, increased his own salary, and leased other properties in which Williams had no ownership interest. Given the deferential "clear error" standard of review, United States v. Zuleta-Alvarez, 922 F.2d 33, 36 (1st Cir. 1990), _____________ ______________ cert. denied, 111 S. Ct. 2039 (1991), and the modest burden and _____ ______ 9 quality of proof incumbent on the government at sentencing, id. ___ at 37 (citing United States v. Mocciola, 891 F.2d 13, 17 (1st _____________ ________ Cir. 1989)), Williams's claim founders on the plain language in U.S.S.G. 6A1.3(a): In resolving any reasonable dispute concern- ing a factor important to the sentencing determination, the court may consider rele- vant information without regard to its admis- sibility under the rules of evidence applic- able at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy. Under U.S.S.G. 6A1.3(a), we repeatedly have upheld reliance on prior hearsay testimony never subjected to cross- examination, so long as there were other adequate indicia of reliability. See, e.g., Wright, 873 F.2d at 441. Here, the ___ ____ ______ Polis testimony was given under oath, subject to the penalties of perjury, in a formal grand jury proceeding that resulted in Williams's indictment on the DARSO counts, as well as the SERVESS counts which were dismissed pursuant to the plea agreement. The district court was provided with the complete transcript of the Polis grand jury testimony, wherein Polis admitted, inter alia, _____ ____ that Williams was still "calling the shots" during the first two years Polis served as President of SERVESS.5 The Polis testimo- ____________________ 5Polis testified as follows: Q: But, Mr. Polis, [why did you sign] a document [the SERVESS-CSI management con- tract] you had never seen before, a document in which you played no role in the negotia- tion of on your first day on the job, which obligated your entity to five years relation- ship with [CSI]. What is the reason you signed it? A: I didn't really feel I had the choice. 10 ny was the only direct evidence before the district court on Williams's influence upon Polis. So far as the record discloses, the Polis testimony was also the only direct evidence before the grand jury on the issue of Williams's "control," and would appear to have been critical to the "probable cause" determination on which Williams's indictment on the SERVESS counts was based. In ____________________ Q: And what was what was it that was taking away your ability to have a choice? A: Stephen Williams and Bruce Kotek. Q: How? A: The fact that they had the contracts and the control. * * * Q: Mr. Polis, in the sort of natural scheme of human relationships, two people who are running an entity don't voluntarily relin- quish all control over it to somebody else on the faint hope that person will turn control right back to them in a consulting agreement or leave control with them by letting them do what they want to do in terms of who they execute leases with and the like. Is it your testimony that there was no conversation . . . in which you indicated that you would continue to do their bidding as director of SERVESS? A: There was a discussion about they had gone to the state, they had gone to an attor- ney, they were coming up with an agreement and that they wanted it signed and that they would become the management entity and I would run the programs. Q: Well didn't somebody ever say at any point in time you're going to continue to do as we tell you to do, Bill. We're making you executive-director but we still call the _____ ____ ___ shots here. _____ A: That's obviously how they felt. Q: And that for a while, that's obviously what happened Mr. Polis? A: Yes. Q: True? A: True. (emphasis added). 11 these circumstances, we think there can be little question that the Polis grand jury testimony was sufficiently reliable to permit reliance by the sentencing court. Compare, e.g., Zuleta- _______ ____ _______ Alvarez, 922 F.2d at 37 (upholding consideration of grand jury _______ testimony where sentencing judge presided over trial and formed independent assessment of reliability), with United States v. ____ ______________ Harris, 982 F.2d 317 (8th Cir. 1992) (upholding refusal to rely ______ on grand jury testimony where sentencing judge doubted its veracity). The sentencing judge was highly conversant both with the facts of the case and Williams's association and involvement with his codefendants in the SERVESS scheme. By the time Wil- liams was sentenced, the judge not only had the benefit of the presentence investigation report and Williams's written response, but the understanding gained from more than two years of pretrial proceedings. Indeed, a few weeks earlier the same judge had sentenced Alexander and Kotek on the SERVESS and the DARSO ___ counts. Cf. Zuleta-Alvarez, 922 F.2d at 37 (holding that en- ___ ______________ hanced deference was due findings of fact where sentencing judge had presided at trial). The district court supportably found that Polis's actions on behalf of SERVESS in entering into the CSI management contract were controlled by Williams. 3. Evidentiary Hearing 3. Evidentiary Hearing ___________________ Finally, Williams argues that the district court's refusal to allow an evidentiary hearing, at which Polis could 12 have been cross-examined, constituted an abuse of discretion. We have yet to hold that it is an abuse of discretion to deny cross- examination in the sentencing context. See United States v. ___ ______________ Regan, 989 F.2d 44, 47 (1st Cir. 1993). _____ Williams has not demonstrated an abuse of discretion here. See Garcia, 954 F.2d at 19. Even though, as Williams ___ ______ alleges, the Polis grand jury testimony on "control" was central to the "relevant conduct" adjustment relating to the SERVESS counts, we cannot say that the district court, which had the benefit of the grand jury transcript and its own long-term famil- iarity with these proceedings, was presented with a compelling basis for conducting an evidentiary hearing to revisit the same ground. Williams was accorded an opportunity to contest, in writing, the government's evidence of "control." Yet he neither proffered rebuttal evidence nor alleged or identified any false grand jury testimony by Polis, but simply disputed the import of Polis's testimony by denying "control" without suggesting what additional or different information might be gleaned from cross- examining Polis. Williams's sheer earnestness in pursuing the request was not enough. In these circumstances, and absent some more concrete proffer, the district court did not abuse its discretion in denying an evidentiary hearing. Affirmed. Affirmed. ________ 13