**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 5, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

KENNETH E. GEORGE,

      Plaintiff - Appellant

v.

DAROLD NEWMAN, in his individual
capacity; KENNETH BLACKBURN,
in his official capacity as Big Horn
County Sheriff,

      Defendants - Appellees.

No. 16-8045
(D.C. No. 1:15-CV-00039-SWS)
(D. of Wyo.)

---

**ORDER AND JUDGMENT**[*]

---

Before **BRISCOE**, **HARTZ**, and **HOLMES** Circuit Judges.

---

Kenneth George sued Deputy Darold Newman and Sheriff Kenneth

Blackburn, both of the Big Horn Sheriff's Department, for using excessive force

during the 2014 arrest of Mr. George's brother. Mr. George also alleged that

Deputy Newman made threatening late-night phone calls to him after the incident.

Mr. George brought federal claims under 42 U.S.C § 1983 and a Wyoming state-

law battery claim. Deputy Newman and Sheriff Blackburn moved for summary

---

[*]     This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

judgment.  The district court granted the motion on all of Mr. George's claims.  Mr. George appealed.

We affirm the district court's ruling on Mr. George's federal claims.  But we reverse the district court's ruling on the Wyoming state-law claim and remand with instructions to dismiss that claim without prejudice.

## I

On September 10, 2014, Chief Christopher Kampbell of the Basin Police Department got a tip that Richard George (the Appellant's brother) was driving drunk.[1]  Chief Kampbell began following Richard as he drove home.  Mr. George, who lived next door to his brother, was driving behind Chief Kampbell.

Richard reached his home's driveway.  Chief Kampbell signaled for him to stop.  Mr. George arrived less than a minute later, pulling into a parking space in front of his own house, which was two spaces over from his brother's car.  Mr. George got out of the car and told Richard to "keep his mouth shut and not leave the property."  Aplt.'s App. at 149 (Dep. of Kenneth George, dated Feb. 10, 2016).  Mr. George went briefly into his home, then came back outside and stood beside his car, watching Chief Kampbell's interaction with his brother.

Chief Kampbell started to perform a sobriety test on Richard.  Mr. George, who was standing a few feet away, became noticeably upset when his brother

---

[1]    Because they share the sir name "George," we refer to the brother of Appellant Kenneth George hereafter only by his first name, "Richard."

cooperated. After a few minutes, Chief Kampbell called for a backup officer. Deputy Newman soon arrived. Traveling down the road leading to Mr. George's home—Richardson Avenue—Deputy Newman was "driving fast . . . with his lights and sirens on." Aplt.'s App. at 437 (Tr. of Dispositive Mots. Hr'g, dated Apr. 7, 2016). Mr. George was "visibly upset," apparently at the manner in which Deputy Newman was driving and started "walking toward him" and ended up "standing within arm's length of [Deputy] Newman's car door." *Id.* at 436–38.

Mr. George alleges that Deputy Newman then "got out of his vehicle and grabbed [his] right arm forcefully." Aplt.'s App. at 9 (Pl.'s Second Am. Compl., dated Nov. 6, 2015). Mr. George said, "What the hell do you think you're doing on my private property? . . . I haven't done anything." *Id.* at 157. Deputy Newman grabbed Mr. George again and told him to stand next to a truck parked nearby. Mr. George admits that he was standing so close to the patrol car that Deputy Newman's "right hand [was] on the window jamb of the [car] door" when he grabbed Mr. George the second time. *Id.* at 164. Mr. George complied at this point and walked toward the truck.

Chief Kampbell eventually arrested Richard and took him to jail. After Chief Kampbell had left, Deputy Newman walked toward Mr. George and told him that "we're [i.e., the officers are] done here." *Id.* at 161. The two men shook hands, and Deputy Newman drove away.

3

On November 21 or 22, 2014, Mr. George met with two attorneys at his home to discuss a possible suit against Deputy Newman. Mr. George eventually filed suit in federal district court against Deputy Newman and Sheriff Blackburn, amending his initial complaint twice. In his second amended complaint—which is the operative one here—Mr. George alleged that Deputy Newman (1) used excessive force, (2) retaliated against him in violation of his First Amendment free-speech rights, (3) retaliated against him in violation of his First Amendment right to petition the government, and (4) committed unlawful battery under Wyoming state law. The two First Amendment claims were originally based on a few threatening late-night phone calls that Deputy Newman allegedly made to Mr. George in September and October 2014. Mr. George claimed that those calls were meant to "threaten[] [him] for reporting Newman's use of excessive force" and to "intimidate [him] so that he would not file a lawsuit against Newman." *Id.* at 11.

The parties conducted discovery. In his deposition, Mr. George testified that he received the threatening phone calls sometime in September or October 2014. He acknowledged that the first two were brief and any threats were not explicit: "one of them said, 'Ken.' The other one said -- well, it just kind of went, 'Uh[.]'" *Id.* at 253. But Mr. George said that "the third was pretty blatant"; the caller stated, "We all get ours in the end." *Id.* However, the phone records available at the time did not show any late-night calls to Mr. George in September or October 2014. Only later, after subpoenaing Mr. George's phone provider a

4

few days after his deposition, did the parties see phone records for the months after October 2014. Those new records showed one late-night phone call was in fact made to Mr. George from an out-of-state caller at 2:07 a.m. on November 23, 2014.

By that time, Deputy Newman had moved for summary judgment on all of Mr. George's claims. Deputy Newman argued that he was entitled to qualified immunity on the excessive-force claim, and that Mr. George's First Amendment retaliation claims failed because Mr. George could not prove that Deputy Newman had ever called him. In response, Mr. George filed a brief with an attached affidavit that referenced the November 23, 2014 phone call. The affidavit stated that the caller had left an answering-machine message in which he "made threatening comments to [Mr. George], causing [him] to believe that someone was trying to intimidate" him into not filing a lawsuit. *Id.* at 303 (Aff. of Kenneth E. George, filed Mar. 14, 2016). The affidavit also stated that Mr. George had received "two other odd messages before then," but both had been "very short" and mostly unintelligible. *Id.* According to Mr. George, it was not until Deputy Newman's deposition that he "recognized [Deputy Newman's voice] as being the voice of the person who left the phone message" on November 23. *Id.*

Deputy Newman moved to strike Mr. George's affidavit and the supplemental phone records that showed the November 23, 2014 call. The district court granted the motion. In doing so, it "agree[d] [that] the affidavit is an attempt

5

to create a sham issue of fact" as to whether Deputy Newman had made the threatening phone calls to Mr. George. *Id.* at 426–27. The court pointed out that the affidavit "only offer[ed] a new recollection of the third late-night phone call that now more accurately fits with his phone records," *id.* at 429, and that Mr. George did "not even assert [he] was confused at the time of the deposition," *id.*, until he filed his response to Deputy Newman's motion to strike, in which he claimed that "his memory was refreshed regarding the timing of the phone calls once he received and reviewed the supplemental phone record," *id.* at 430. In sum, the court granted the motion to strike, rejecting what it viewed as Mr. George's effort to create a sham fact issue to avoid summary judgment. And, because the now-stricken affidavit was the only connection between the supplemental phone records and the First Amendment retaliation claims, the court excluded those records as irrelevant.[2] Perceiving these retaliation claims to be devoid of evidentiary support, the court entered judgment regarding them in favor of Deputy Newman.

The district court also granted judgment to Deputy Newman regarding Mr. George's Fourth Amendment claim, finding that Deputy Newman's use of

---

[2] The court also found that, even if Mr. George's account of the third November phone call was accurate, the message that was supposedly delivered in that call—i.e., "We all get ours in the end"—was not sufficient to give rise to First Amendment violations because it would not have chilled a person of ordinary firmness from continuing to engage in protected activity. Aplt.'s App. at 433.

6

force was objectively reasonable.  The court also entered judgment against Mr. George's state-law battery claims *with* prejudice, pointing out that Wyoming battery is not actionable when an officer uses objectively reasonable force on a person.

On appeal, Mr. George challenges the district court's rulings on all of his claims.

## II

We review de novo the district court's grant of summary judgment.  *Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013).  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  We view the facts in the light most favorable to the nonmovant and draw all reasonable inferences in his favor.  *See, e.g.*, *Talavera ex rel. Gonzalez v. Wiley*, 725 F.3d 1262, 1267 (10th Cir. 2013).

## A

In his summary-judgment motion, Deputy Newman raised a qualified-immunity defense to Mr. George's Fourth Amendment claim.  Qualified immunity protects governmental officials from liability for civil damages for conduct that does not violate clearly established federal statutory or constitutional rights.  *See, e.g.*, *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  The doctrine also protects those employees from the burdens of litigation.  *See, e.g.*, *Allstate Sweeping,*

7

*LLCV v. Black*, 706 F.3d 1261, 1266 (10th Cir. 2013). When a defendant asserts a qualified-immunity defense, the plaintiff must show (1) that the defendant violated a federal right, and (2) that the right was clearly established at the time of the challenged conduct. *See, e.g.*, *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015). If a plaintiff fails to establish either prong, the defendants are entitled to qualified immunity. *Id.*

We review qualified-immunity summary-judgment decisions differently from other summary-judgment decisions. *Cortez v. McCauley*, 478 F.3d 1108, 1114 (10th Cir. 2007) (en banc). We "accept the plaintiff's version of the facts," so long as that version "find[s] support in the record." *A.M. v. Holmes*, 830 F.3d 1123, 1136 (10th Cir. 2016) (quoting *Thomson v. Salt Lake City*, 584 F.3d 1304, 1312 (10th Cir. 2009)); *see also York v. City of Las Cruces*, 523 F.3d 1205, 1201 (10th Cir. 2008) ("[W]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]") (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007))).

In dismissing Mr. George's excessive-force claim, the district court addressed only the first prong of the qualified-immunity analysis—specifically, whether a constitutional violation occurred at all. We also follow this path.

The central inquiry is whether Deputy Newman's use of force was "reasonable" under the Fourth Amendment. *See, e.g.*, *Graham v. Connor*, 490

8

U.S. 386, 395 (1989) ("[*A*]*ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ."). We ask "whether the officers' actions were 'objectively reasonable' in light of the facts and circumstances confronting them, *without* regard to their underlying intent or motivation." *Thomson*, 584 F.3d at 1313 (emphasis added) (quoting *Graham*, 490 U.S. at 397).

In evaluating the reasonableness of an officer's actions, we "balance . . . the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 664 (10th Cir. 2010) (quoting *Graham*, 490 U.S. at 396). In doing so, we consider the totality of the circumstances, examining factors including the three that the Supreme Court in *Graham* highlighted: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Thomson*, 584 F.3d at 1313 (quoting *Graham*, 490 U.S. at 396). We underscore that our inquiry is not limited, however, to these three *Graham* factors. *See Graham*, 490 U.S. at 396 ("[P]roper application requires careful attention to the facts and circumstances of each particular case."); *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008) ("We assess objective reasonableness based on 'whether the totality of the circumstances

9

justified the use of force,' and 'pay careful attention to the facts and circumstances of the particular case.'" (quoting *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995))).

We weigh the totality of the circumstances from the perspective of a reasonable officer on the scene. *See, e.g.*, *Cavanaugh*, 625 F.3d at 664–65 (stating that totality-of-the-circumstances test does not rely on "the 20/20 vision of hindsight") (quoting *Graham*, 490 U.S. at 396). We also understand that "officers may have 'to make split-second judgments in uncertain and dangerous circumstances.'" *Thomson*, 584 F.3d at 1313 (quoting *Phillips v. James*, 422 F.3d 1075, 1080 (10th Cir. 2005)). And, relatedly, we acknowledge that "the Fourth Amendment 'does not require [police officers] to use the least intrusive means in the course of a detention.'" *Marquez v. City of Albuquerque*, 399 F.3d 1216, 1222 (10th Cir. 2005) (quoting *United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994)).

In challenging the district court's Fourth Amendment ruling, Mr. George repeatedly objects to the district court's characterization of certain facts in the summary-judgment record. Specifically, he contends that the district court erred by viewing the evidence in the light most favorable to Deputy Newman and that the district court treated disputed facts as undisputed. Since our review is de novo, we generally "need not separately address such arguments" and may proceed to the merits at the heart of the matter. *See, e.g.*, *Rivera v. City & Cty. of Denver*, 365

10

F.3d 912, 920 (10th Cir. 2004) ("Because our review is de novo, we need not separately address Plaintiff's argument that the district court erred by viewing evidence in the light most favorable to the City and by treating disputed issues of fact as undisputed."). However, our summary-judgment analysis would benefit from addressing at the outset some of Mr. George's more salient factual contentions because we conclude that they are "blatantly contradicted by the record." *Scott*, 550 U.S. at 380; *accord Henderson v. Glanz*, 813 F.3d 938, 950 (10th Cir. 2015).

For instance, Mr. George argues that he did not approach Deputy Newman's car, as the district court had found. Instead, Mr. George claims that Deputy Newman "slid into the yard of [Mr. George] and stopped next to [Mr. George]." Aplt.'s Opening Br. at 20 n.14. However, Mr. George himself testified that he was "walking towards [Deputy Newman] the whole time," and that after Deputy Newman came "sliding into [his] yard, [he] was walking up to the front of the car." Aplt.'s App. at 156. And he testified that Deputy Newman had not pulled up beside him; rather, "[he] was walking up to [Deputy Newman]" when Deputy Newman got out of his car. *Id.* at 159. Since Mr. George's own testimony contradicts his briefing assertion that he did not approach Deputy Newman's car, we cannot accept this account as true. *See, e.g.*, *A.M.*, 830 F.3d at 1136 (noting that we "accept the plaintiff's version of the facts," so long as that version "find[s] support in the record").

11

Mr. George also argues that he was not visibly upset when Deputy Newman arrived. But the record belies this assertion. Indeed, Mr. George's own deposition testimony makes it clear that he was *visibly* angry about something when Deputy Newman arrived. As explicated *infra*, it ultimately does not matter what caused Mr. George to be angry, but the circumstances unfolding at the scene validate that he in fact was visibly angry. Mr. George's anger may have stemmed from his brother getting into trouble and cooperating with Chief Kampbell's drunk-driving investigation, or from Deputy Newman's fast driving, or—quite likely—from both. In any event, his anger was noticeable.

In this regard, Mr. George testified that he was "P.O.'d at [his] brother" and "upset that he would create a situation like that for himself again." Aplt.'s App. at 231. He testified that, when Richard admitted to Chief Kampbell that he'd been drinking, Mr. George "put [his] hands up in the air and walked back towards [his] house . . . shaking [his] head." *Id.* at 154. Mr. George also was apparently upset at Deputy Newman for the fast manner in which he drove down the road. Mr. George described Deputy Newman's driving as reckless and dangerous. He said that he only started walking "[w]hen I seen [sic] [Deputy Newman] come racing" down Richardson Avenue and saw "what he was doing." *Id.* at 162, 163.

> And then I looked up the street, and here -- I don't understand why they do that, because there wasn't anything going on, but he was speeding down the street where kids play. I was the one that had the signs to slow the heck down because kids are playing, and they're posted along there. . . . Because I didn't want anybody

12

speeding down that street because all the kids that play in that street.

. . . .

But anyway, here [Richard] is in handcuffs, and I looked up the street, and I noticed a Sheriff come blasting down the street with his lights on. Pulls up, slides into my yard. His car wasn't all the way in it, but his front wheel and part of the front of the car was on my property. . . . And I was walking towards him the whole time. I was walking towards him, watching him come down the street. And I was -- Why is he -- what? There's no accident around here. My brother's in handcuffs. I haven't been accosting anybody or saying anything. I said that one thing to my brother, and that was it. Next thing we know, he comes sliding into my yard, and I was walking up to the front of the car, and I said, "Hey, what's up?"

*Id.* at 237–38. Mr. George acknowledged that he typically has become angry whenever he sees somebody speeding down Richardson Avenue. He conceded that, "[n]ormally, [he] throw[s] rocks at people," even his "own neighbors if they're speeding," and said that he "just get[s] upset when [he] think[s] about that." *Id.* at 162–63. So given his testimony about Deputy Newman—whom he described as "racing," "speeding," and "blasting" down Richardson Avenue in his patrol car—the record strongly suggests that Mr. George also was visibly upset at Deputy Newman's fast-paced travel down Richardson Avenue.

At bottom, the source of Mr. George's anger is not the material point. What matters is whether the record clearly establishes that he was *visibly* upset about

13

something when he approached Deputy Newman's patrol car.[3] This objective circumstance would not have been lost on a reasonable officer present at the scene. *See, e.g.*, *Cavanaugh*, 625 F.3d at 664–65 (noting that our excessive-force analysis requires us to adopt the perspective of a reasonable officer on the scene). Substantially through Mr George's own testimony we may conclude that the record does clearly establish this fact. And the deposition testimony of Deputy Newman and Chief Kampbell bolsters this conclusion. Deputy Newman said that Mr. George was pacing, and that from his body language, Mr. George looked like "a man that was upset about something." Aplt.'s App. at 72 (Dep. of Darold Newman, dated Feb. 11, 2016). Chief Kampbell said that Mr. George "immediately started yelling" when Chief Kampbell arrested Richard, and that Mr. George was "pacing and yelling" throughout the episode. *Id.* at 61, 62 (Dep. of Christopher Kampbell, dated Feb. 11, 2016).

With these salient factual contentions addressed, we turn to the central legal question regarding the Fourth Amendment claim: whether Deputy Newman's use of force was reasonable. We answer that question in the affirmative. Responding

[3] Mr. George repeatedly argues that there is no evidence to show that he was in fact angry at Deputy Newman during the encounter. *See, e.g.*, Aplt.'s Reply Br. at 2 ("Newman presents no undisputed material evidence that George was angry at Newman at any time before Newman used force on him."). But, as noted *supra*, this point is immaterial. We are concerned with the objective circumstances that would have been within the ken of a reasonable officer at the scene, not with Mr. George's subjective state of mind (e.g. the actual source of Mr. George's anger).

14

to a call for backup, Deputy Newman approached the scene in his patrol car. Before he could exit the vehicle and determine what assistance Chief Kampbell required, a visibly upset man—Mr. George—walked towards his vehicle, stood next to the driver's side door, and started questioning him. Under these circumstances, it was not unreasonable for Deputy Newman to do what he did: to get out of his vehicle, firmly move the man away from the vehicle, and try to establish control of the situation by directing the man to stand back. And when Mr. George did not immediately comply with Deputy Newman's direction and, according to Mr. George's own testimony, became confrontational, it was not unreasonable for Deputy Newman to grab Mr. George's arm and move him away.

Arguing to the contrary, Mr. George contends that the *Graham* factors cut in his favor: specifically, Mr. George notes that he had committed no crime, was not a threat to the officers or to other people, and was not resisting arrest or trying to flee. *See Graham*, 490 U.S. at 396. But we must use the perspective of a reasonable officer in Deputy Newman's position. *See Cavanaugh*, 625 F.3d at 664–65. From that perspective, at the very least, it would not have been clear to such a reasonable officer that Mr. George was not a threat to the officers or other people. In this regard, the district court correctly observed: "A reasonable officer would have reason to be concerned for his own safety as well as the safety of others. One of the purposes of calling for backup is to ensure the initial officer is safe and the scene is secure and bystanders are controlled." Aplt.'s App. at 438.

15

And it would be improper for us to engage in a "retrospective inquiry" into whether Deputy Newman used the least forceful means possible to address this potential threat. *Jiron v. City of Lakewood*, 392 F.3d 410 (10th Cir. 2004) ("Perhaps the situation might have been more peacefully resolved had Officer Halpin waited for backup to arrive. We cannot answer that question, nor is this kind of retrospective inquiry relevant."); *see Marquez*, 399 F.3d at 1222 (noting that "the Fourth Amendment does not require [police officers] to use the least intrusive means in the course of a detention" (quoting *Melendez-Garcia*, 28 F.3d at 1052)).

Moreover, even though Deputy Newman had no reason to believe that Mr. George had committed a crime, an officer in his position who was responding to a call for backup ordinarily would have been entitled to use some force against a non-suspect to secure the scene of an investigation and ensure his own safety. *See Walker v. City of Orem*, 451 F.3d 1139, 1149 (10th Cir. 2006) ("The Supreme Court has recognized that detention or control of both suspects and non-suspects may be necessary to insure officer safety and to maintain the officers' control over a crime scene."). To be sure, this first *Graham* factor regarding the severity of the crime at issue would typically weigh in favor of only a modest degree of force when the individual subjected to the force had committed no crime. But Deputy Newman could have reasonably believed that his shoving and grabbing Mr. George qualified as such modest force under the circumstances present here.

16

In sum, having considered the totality of the circumstances, we conclude that Deputy Newman applied a reasonable amount of force to Mr. George—*viz.*, his application of force to him was not excessive. Accordingly, Deputy Newman did not violate Mr. George's Fourth Amendment rights and is entitled to qualified immunity.

**B**

In attacking the district court's resolution of his First Amendment retaliation claims, Mr. George contests the court's decision to strike his March 14, 2016 affidavit. Recall that the court did so on the grounds that Mr. George was attempting to create a sham issue of material fact in order to defeat Deputy Newman's summary-judgment motion. He also argues that the court's related decision to exclude the supplemental phone records was erroneous. We need not, however, reach these contentions of error. Irrespective of whether the district court erred regarding these matters, we conclude that Mr. George has failed to state viable First Amendment retaliation claims. Put another way, even if we factored Mr. George's affidavit and the supplemental phone records into the summary-judgment calculus, Mr. George could not prevail on his First Amendment retaliation claims. Therefore, any error by the district court regarding these matters would be harmless.

When a government defendant is neither the plaintiff's employer nor a party to a contract with the plaintiff, a plaintiff bringing a First Amendment retaliation

17

claim must show three elements: (1) that the plaintiff was engaged in constitutionally protected activity, (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) that the defendant's adverse action was substantially motivated by the plaintiff's exercise of constitutionally protected conduct. *See, e.g.*, *Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007); *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000).

In his second amended complaint and his March 14 affidavit, Mr. George described the following circumstances regarding his First Amendment retaliation claims:

- Mr. George met with his attorneys on November 21 or 22, 2014 to discuss filing a lawsuit against Deputy Newman. Aplt.'s App. at 302.

- Then, at 2:07 a.m. on November 23, 2014, someone called his home and left a message with a cryptic warning that "[w]e all get ours in the end." *Id.* at 173; *see id.* at 303.

- Mr. George says that it was not until months later, at Deputy Newman's deposition, that he became aware that it was Deputy Newman who placed the November 23 call. *See id*. at 303.

- Mr. George also averred that "he had received two other odd messages on my phone prior to that one, but they had been very short, with a man saying, 'Ken' on one and 'ugh' on the other." *Id.*

18

It is axiomatic that we can affirm on any ground supported by the record. *See, e.g.*, *Elkins v. Comfort*, 392 F.3d 1159, 1162 (10th Cir. 2004) ("We have discretion to affirm on any ground adequately supported by the record."); *accord Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1088 (10th Cir. 2006). With this proposition in mind, we conclude that, even accepting the truth of Mr. George's allegations and taking into account the supplemental phone records, Mr. George cannot prevail on his First Amendment retaliation claims because he has not demonstrated that Deputy Newman made any call—including the more explicit November 23 call—*because* of Mr. George's protected activity, specifically, his meeting with his attorneys. Nothing in the record suggests that Deputy Newman even knew about Mr. George's attorney meeting on November 21 or 22, 2014. Even if the November 23 caller was Deputy Newman, his message did not mention anything about lawyers, lawsuits, or a potential legal action against him. Simply put, there is no evidence that shows a connection between any of the alleged phone calls to Mr. George and his meeting with his lawyers—let alone evidence that the alleged calls were "substantially motivated" by this meeting. *Shero*, 510 F.3d at 1203.

To be sure, Mr. George argues that the timing of the November 23 call is enough to show such a causal connection. But temporal proximity alone is not enough to make out a First Amendment retaliation case at the summary-judgment stage. *See, e.g.*, *Trant v. Okla.*, 754 F.3d 1158, 1170 (10th Cir. 2014)

19

("[T]emporal proximity between the protected speech and the alleged retaliatory conduct, without more, does not allow for an inference of a retaliatory motive."); *accord Couch v. Bd. of Trustees*, 587 F.3d 1223, 1236 (10th Cir. 2009); *Baca v. Sklar*, 398 F.3d 1210, 1221 (10th Cir. 2005). Instead, a plaintiff has to show "some facts [that] demonstrate the defendants 'acted on the basis of a culpable subjective state of mind' to satisfy the third [causation] step." *Trant*, 754 F.3d at 1170 (quoting *McCook v. Spriner Sch. Dist.*, 44 Fed. App'x 896, 905 (10th Cir. 2002)). Mr. George has not demonstrated such facts, so he cannot put forward viable First Amendment retaliation claims. We affirm the district court's grant of summary judgment on these claims.

## C

The district court granted summary judgment on Mr. George's battery claim on state-law grounds. Specifically, the court held that Wyoming only allows battery claims to proceed when an officer's use of force is excessive. *See, e.g.*, *Kimbley v. City of Green River*, 663 P.2d 871, 888 (Wyo. 1983) ("There is no evidence of any actionable assault and battery on the appellants. . . . Many, if not most, arrests are bound to involve some touching, but this does not become actionable unless excessive, of which courts will then take[] cognizance.").

Mr. George argues that the district court erred in dismissing his claim with prejudice. He contends that the court should have dismissed the claim without prejudice so that he could pursue it in state court. We agree. We have held that

20

"[i]f federal claims are dismissed before trial, leaving only issues of state law, 'the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.'" *Brooks v. Gaenzle*, 614 F.3d 1213, 1229–30 (10th Cir. 2010) (quoting *Bauchman v. W. High Sch.*, 132 F.3d 542, 549 (10th Cir. 1997)). Whenever a district court dismisses a state-law claim with prejudice before trial, we typically reverse and remand with instructions to dismiss without prejudice. *See, e.g.*, *Estate of Reat v. Rodriguez*, 824 F.3d 960, 967 (10th Cir. 2016); *Merrifield v. Bd. of Cty. Comm'rs*, 654 F.3d 1073, 1086 (10th Cir. 2011); *Brooks*, 614 F.3d at 1229.

We adopt this approach here. We reverse the district court's ruling on Mr. George's state-law battery claim and remand with instructions to dismiss the claim without prejudice.

### III

For the foregoing reasons, we affirm the district court's rulings on Mr. George's federal claims. But we reverse the court's order resolving Mr. George's Wyoming state-law claim with prejudice and remand with instructions to dismiss that claim without prejudice.

ENTERED FOR THE COURT


Jerome A. Holmes
Circuit Judge

21